**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| REBECCA STANFORD, an individual, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 18 C 3703 |
| FOX COLLEGE, an Illinois corporation | ) | |
| doing business as Fox College, | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

From 2015 through 2017, Plaintiff Rebecca Stanford was enrolled in Defendant Fox College, Inc., in a two-year training program for work as a Physical Therapy Assistant. In the final term of the program, participants were placed at a physical therapy clinic for hands-on training. Before her final term began, Plaintiff informed Fox College administrators that she was pregnant, and both parties agreed to a plan in which she would be granted additional time to complete the course. The clinic where she was scheduled for the hands-on course cancelled its participation in the program, however, and Plaintiff found the clinic Fox College assigned her to as an alternative unacceptable. Plaintiff withdrew from the program for one term, but she returned after she gave birth and completed her degree. She soon passed the state licensing exam and found a job as a physical therapy assistant. Plaintiff brought this action against Fox College, alleging that it discriminated against her because of her pregnancy and intentionally inflicted emotional distress. Defendant has moved for summary judgment [42] on all counts, while Plaintiff has filed a motion to strike [49] certain documents supporting Defendant's motion. For the reasons discussed below, the court grants Defendant's motion and denies Plaintiff's.

<u>**FACTS**</u>

**I.      Motion to Strike**

The facts relevant to this dispute are set forth in the parties' competing Rule 56.1 statements. Before recounting those facts, the court pauses to address Plaintiff's motion to strike

three of the affidavits that Defendant has submitted, on the ground that they are not "made on personal knowledge," do not present admissible evidence, or were not submitted by a competent witness. FED. R. CIV. P. 56(c)(4). Rule 56(c)(2) permits a party to raise such objections, but motions to strike "are disfavored except when they serve to expedite the work of the court," *Maldonado v. Mount Sinai Hosp. Med. Ctr. of Chi.*, No. 08 C 6141, 2010 WL 63986, at *3 (N.D. Ill. Jan. 6, 2010) (citing *RLJCS Enters., Inc. v. Prof'l Ben. Tr., Inc.*, 438 F. Supp. 2d 903, 906–07 (N.D. Ill. 2006)).

Plaintiff's motion attacks portions of Defendant's affidavits as lacking foundation or constituting hearsay. Plaintiff also argues that the affidavits refer to documents attached as exhibits that have not been authenticated, use "we" in a way that Plaintiff finds confusing and interprets to mean that an affiant lacks personal knowledge, and include conclusory statements or legal conclusions. These objections are puzzling at best. For example, some statements that Plaintiff contends lack foundation concern the affiants' job responsibilities, a matter about which they do have personal knowledge. Her authenticity challenge to the messages attached as exhibits to the affidavits has no more traction; the affiants were either the senders or recipients of the messages, enabling them to authenticate the messages. Beyond that, Plaintiff herself authenticated them in her own deposition.[1] *See Fenje v. Feld*, 301 F. Supp. 2d 781, 789 (N.D. Ill. 2003) ("Even if a party fails to authenticate a document properly or lay a proper foundation, the opposing party is not acting in good faith in raising such an objection if the party nevertheless knows that the document is authentic.") Plaintiff also objects to these messages on hearsay grounds, but many (particularly, for example, the messages Plaintiff exchanged with College administrators in February 2017) are statements that Plaintiff alleges reflect adverse action

---

[1] Referring to exhibits with page numbers of RS24 through RS39, defense counsel asked Plaintiff whether "they are the e-mails that you testified about between you and Mrs. Fawcett and Ms. Flemings and administration at Fox College," and she responded "Yes." (Pl.'s Dep., Ex. 1 to Def.'s Statement of Material Facts, [44-1] at 41:12–16.)

against her and therefore have a non-hearsay purpose. In fact, it is unclear how Plaintiff expects to prove her case if such communications are inadmissible. Finally, at least two of Plaintiff's objections are plainly frivolous: a reference in Carol Fawcett's declaration to "Tinley, Illinois" as opposed to "Tinley Park, Illinois" and a misspelled name in Rachel Kreft's declaration ("Fleming" rather than "Flemings") were obviously non-substantive typographical errors. Plaintiff's objections to them does nothing to "expedite the work of the court."

Tellingly, Plaintiff's opposition to Defendant's Rule 56.1 statement [44] relies on these objections (and nothing more) with respect to many of Defendant's statements of material fact. (*See* Pl.'s Objs. & Resp. to Def.'s Statement of Material Facts [61] ¶¶ 20, 22, 24–27, 34, 36, 42.) To rebut such statements effectively, Plaintiff must do more, specifically "including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting material relied upon" when responding to an opponent's factual statements. Local Rule 56.1(b)(3); *see also* FED. R. CIV. P. 56(e)(3) (providing that a court may consider a fact undisputed "[if] a party fails to properly support an assertion of fact or fails to properly address another party's assertion"). The court is not required here to "provide a detailed analysis of why each paragraph or statement is or is not improper legal opinion, or conclusory, or based on hearsay." *RLJCS Enters.*, 438 F. Supp. 2d at 907. Many of the statements to which Plaintiff has objected are not material to the court's ruling or are supported by other evidence—including Plaintiff's own deposition. Defendant also submitted an additional affidavit, to which Plaintiff has not objected, that covers similar ground.[2] Any specific objections will be discussed below where relevant.

## II.    Motion for Summary Judgment

Plaintiff Rebecca Stanford was a student of Defendant Fox College, Inc., an Illinois corporation that offers courses in different business and healthcare fields. (Def.'s Statement of

---

[2]      (Decl. of Monique Flemings, Ex. 1 to Def.'s Resp. in Opp'n to Pl.'s Mot. to Strike, [54-1].)

Material Facts [44] ¶¶ 1, 2, 5.)  Plaintiff enrolled in Defendant's Physical Therapy Assistance ("PTA") program in August 2015.  (*Id.* ¶ 6.)  The PTA program at Fox College comprises eight terms of eight weeks each.  (*Id.* ¶ 9.)  Two of those terms—one at the program's midpoint and one at the very end—are clinical courses (*id.*) in which students are placed at a clinic or other medical facility where they practice working with patients under the supervision and instruction of a clinical instructor (Pl.'s Dep. at 16:6–17:21).  During their clinical placement, students are required to work five days or forty hours per week.  (*Id.* at 16:22–24.)  The PTA program handbook, which Plaintiff received and signed, warns students that working as a PTA requires, among other capabilities, "the ability to safely bend, twist, and lift" patients; "coordination, balance and strength"; and "the agility to move quickly to ensure patient safety."  (Fox Coll. Physical Therapist Assistant Program Student Handbook, Ex. A to Decl. of Rachel Kreft, Ex. 4 to Def.'s Br. in Supp. of Summ. J., [44-4] at 14.)[3]

Plaintiff completed her first clinical placement at Manor Care, an inpatient skilled nursing facility.  (Pl.'s Dep. at 12:23–13:8.)  Her final clinical class was scheduled to take place in January and February of 2017.  (*Id.* at 15:7–10.)  In September 2016, Plaintiff informed Carol Fawcett, the director of the PTA program, and Monique Flemings, the director of clinical education for the PTA program, that she was pregnant and that her due date (February 7, 2017) fell during this final clinical placement.  (*Id.* at 14:2–14.)  She wanted to make sure that her pregnancy would not cause any issues with her ability to finish the program.  (*Id.* at 14:16–18.)  Plaintiff intended to begin her clinical work for a few weeks in January, and then, after childbirth and recovery, complete the remaining hours of clinical work she needed.  (*Id.* at 15:17, 18:5–21.)  Plaintiff

---

[3]       Plaintiff objects to handbook references in Kreft's declaration as incomplete (Pl.'s Mot. to Strike at 5-6), but has not identified any other portions of the handbook that in fairness "ought to be considered at the same time." FED. R. EVID. 106.  In any case, the relevance of this material is limited; neither side has suggested that physical limitations imposed by Plaintiff's pregnancy (as opposed to her need for a brief leave of absence) were reasons for difficulty in finding a clinical placement for her.

testified that her pregnancy would not have prevented her from completing such a schedule at a clinic.[4]  (*Id.* at 32:22–33:13.)

Defendant initially informed Plaintiff in November 2016 that she would be placed at a facility in Tinley Park, Illinois for her second clinical course.  (Pl.'s Dep. at 19:19–20:16.)  Flemings and Fawcett were both aware of Plaintiff's pregnancy when they assigned her to the Tinley Park location (Def.'s Statement of Material Facts [44] ¶ 23), and Plaintiff herself had no concerns about that placement.  (Pl.'s Dep. at 20:5–7.)  Unfortunately, however, the Tinley Park facility cancelled her placement for her clinical course.  (Decl. of Carol Fawcett, Ex. 3 to Def.'s Br. in Supp. of Summ. J., [43-3] ¶ 4 ("[T]hat site cancelled the placement.").)  Both Fawcett and Flemings stated in their declarations that they do not recall why it cancelled.  (*Id.*; Decl. of Monique Flemings ¶ 3.)  Such cancellations are not unusual, according to Flemings, because the clinics are not paid by Defendant or otherwise obligated to accept any students.  (Decl. of Monique Flemings ¶ 3.)  Plaintiff, however, testified at her deposition that she was given two different reasons for the cancellation.  (Pl.'s Dep. at 21:8–12.)  Although she could not recall the order in which she received the two explanations, it appears that she was initially told that the placement had been cancelled because the clinic was not going to be available for the January term.[5]  (*Id.* at 21:9–10; *see* Engrade Message from Rebecca Stanford to Monique Flemings (Nov. 16, 2016, 4:15 P.M.),

---

[4]    There is evidence, however, that Plaintiff was hospitalized for one day with a gastrointestinal issue in the twenty-eighth week of her pregnancy.  (Decl. of Rebecca Stanford, Ex. 1 to Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss Cts. II, III & IV of Compl., [18-1] ¶ 6.)  She also says she suffered from several migraines that were so severe she "could not function or even be in a room with artificial lighting."  (*Id.* ¶ 7.)  One migraine was so bad that Plaintiff thought she was having a stroke, which caused her to miss a day of school.  (*Id.*)

[5]    The record does not reveal whether other students had been placed at the Tinley Park facility or, if there had been others placed there, whether those placements were cancelled as well.

Ex. 2 to Def.'s Statement of Material Facts, [44-2] at RS25.)[6]  Plaintiff testified that Flemings subsequently told her that the Tinley Park facility cancelled because they could not accommodate her pregnancy (Pl.'s Dep. at 21:10–12), though Defendant appears to dispute this (*see* Def.'s Reply to Pl.'s Concise Statement of Material Facts [63] ¶ 6).  The record shows that Flemings advised Plaintiff that Defendant had to "negotiate[ ]" with sites "due to your pregnancy" and that it had to disclose her pregnancy to any clinic because "[t]he site must decide if they can take you from Jan–March 2017, due to your delivery date."  (Engrade Message from Monique Flemings to Rebecca Stanford (Nov. 16, 2016, 12:36 P.M.) [44-2] at RS25; Engrade Message from Monique Flemings to Rebecca Stanford (Nov. 17, 2016, 9:19 A.M.) [44-2] at RS26.)

Shortly after the Tinley Park clinic cancelled the placement, Plaintiff was informed that she would be placed at Comprehensive Therapy, an outpatient clinic in Gary, Indiana.  (*Id.* at 22:20–21.)  Comprehensive Therapy was willing to extend her clinical course into March to accommodate her childbirth.  (Decl. of Monique Flemings ¶ 4.)  Upon being notified of that site assignment, Plaintiff complained to Flemings that it was "40 miles away in winter time" and that she "cannot imagine getting there with any ease or piece [sic] of mind especially if an emergency happens."  (Engrade Message from Rebecca Stanford to Monique Flemings (Nov. 16, 2016, 12:07 P.M.) [44-2] at RS24.)  Plaintiff was aware that other students had been placed at Comprehensive Therapy.  (Pl.'s Objs. & Resp. to Def.'s Statement of Material Facts [61] ¶ 10.)  Flemings responded by explaining that Defendant was not able to place her at any closer clinic, and that Comprehensive Therapy's location complies with the College's policy, which states that a student can be placed anywhere within an hour of the school.  (Engrade Message from Monique Flemings to Rebecca Stanford (Nov. 16, 2016, 12:36 P.M.) [44-2] at RS25.)  Indeed, the handbook that Plaintiff signed stated that school administrators would "make every effort to place a student

---

[6]     "Engrade" refers to a student website used by Fox College through which students can see their grades, access class materials, and message faculty and administrators.  (*See* Pl.'s Dep. at 30:2–8.)

at a location that will require no more than one hour of drive time each way from the Fox College Tinley Park Learning Site when possible." (Fox Coll. Physical Therapist Assistant Program Student Handbook at 28.) Plaintiff does not dispute that Comprehensive Therapy fell within that one-hour radius. (Pl.'s Objs. & Resp. to Def.'s Statement of Material Facts [61] ¶ 10.) Flemings told Plaintiff that if she did not want the clinical placement at Comprehensive Therapy, she would have to "withdraw from the program and return after [her] delivery." (Engrade Message from Monique Flemings to Rebecca Stanford (Nov. 16, 2016, 12:36 P.M.) [44-2] at RS25.)

Plaintiff also wrote to Flemings that she was "aware of situations where students have had to find their own clinical placements" and asked whether that was an option for her. (Engrade Message from Rebecca Stanford to Monique Flemings (Nov. 17, 2016, 10:54 A.M.) [44-2] at RS26.) Flemings responded:

> The option for you to find your own clinical is not an option at this point. Your reference to other students finding their own clinical spots in your cohort has to do with a different situation, and at the approval of the Program Director and the Campus Director. Students having the ability to select their clinical locations goes against our program policy.

(Engrade Message from Monique Flemings to Rebecca Stanford (Nov. 17, 2016, 11:06 A.M.) [44-2] at RS27.) In that same message, Flemings also reassured Plaintiff that "[t]he clinical placement location [that is, Comprehensive Therapy] is an excellent location" and that "[t]his site is right off the expressway and [Defendant] ha[s] placed numerous students in this location without any safety concerns." (*Id.*)

Fawcett explained in her declaration that "[s]tudents are not permitted to select their own clinical sites" because "[t]he school has to assure that a clinic has met all of the required standards and must enter into an affiliation agreement with Fox College." (Decl. of Carol Fawcett ¶ 6.) Kreft stated in her declaration that "[s]tudents are not permitted to select their own placements, even if the clinic has an Affiliation Agreement [with the College], to avoid such problems as a PTA student returning to a former place of work or a location where they have a friend or family member, which could dilute the educational value of the experience." (Decl. of Rachel Kreft ¶ 4.) On only one

occasion has Defendant allowed an exception to this rule, Kreft noted, "where a student had a criminal background and he had to find his own placement, with our assistance, due to strict screening requirements for health care workers." (*Id.*) Plaintiff testified consistently with this; she asserted at her deposition that other students were "permitted to look for a site that would possibly allow them accommodation based on criminal background. There is one student in our cohort who matches that description." (Pl.'s Dep. at 30:19–22.) She acknowledged that she is not aware of any other student being granted an exception to the rule. (*Id.* at 31:10–12.) There is no evidence in the record that Defendant has provided such an accommodation on any other occasion.

Rather than accepting the clinical placement at Comprehensive Therapy, Plaintiff withdrew temporarily from the program. (*See* Decl. of Monique Flemings [54-1] ¶ 6–7.) Typically, a student who withdraws from Defendant's program can return only after undergoing "a re-admission process, including testing." (Pl.'s Dep. at 29:11–16.) Plaintiff's pregnancy was deemed an "extenuating circumstance," and Fawcett assured Plaintiff she was free to return to the PTA program without having to go through the admissions process again. (Engrade Message from Carol Fawcett to Rebecca Stanford (Nov. 18, 2016, 9:39 A.M.) [44-2] at RS29.) According to Kreft, "[t]his was offered to her so she would not risk being unable to complete her program if she started before her baby was born and then was unable to complete [the clinical course] within the term. That would have resulted in an incomplete, which would have required her to start the clinical course over again." (Decl. of Rachel Kreft ¶ 7.) Because of this arrangement, Plaintiff chose to withdraw at the end of December with the intent of returning for her clinical course at the start of the next term. (Engrade Message from Rebecca Stanford to Carol Fawcett (Nov. 18, 2016, 10:25 A.M.) [44-2] at RS30.) Fawcett instructed Plaintiff to contact Flemings in January 2017 so she could receive her clinical placement. (Engrade Message from Carol Fawcett to Rebecca Stanford (Nov. 18, 2016, 2:49 P.M) [44-2] at RS30.)

In early January, Plaintiff contacted Flemings as instructed to confirm her intent to return to the program at the end of February. (Engrade Message from Rebecca Stanford to Monique Flemings (Jan. 9, 2017, 9:56 A.M.) [44-2] at RS31.) Flemings told her that the College needed a statement of release from Plaintiff's physician in case she had any restrictions that would need to be shared with a clinical site, and told her the College would need one week's notice when Plaintiff was ready to return. (Engrade Message from Monique Flemings to Rebecca Stanford (Jan. 9, 2017, 10:37 A.M.) [44-2] at RS31.)

On February 6, 2017, Fawcett emailed Plaintiff and told her that because she had not yet had her baby and thus had not yet received medical clearance, "it does not appear you will be able to be placed to begin your final clinical experience on February 27th as we are 3 weeks from the start date." (Email from Carol Fawcett to Rebecca Stanford (Feb. 6, 2017, 12:08 P.M.) [44-2] at RS34.) Fawcett also informed Plaintiff that if she did not have a placement by February 27, she would have to wait to do her clinical course until the next term—which would not start until May 1. (*Id.*) "Pushing back the start date," Fawcett continued, "will mean you have been out of the program more than 60 days so you will be required to go through the readmission process. As we discussed, we can only waive the readmission process if you were only out one term." (*Id.*) In Plaintiff's response to Fawcett, she explained that she was scheduled to be induced on February 9 and expected to have the baby either on the 9th or 10th. (Email from Rebecca Stanford to Carol Fawcett (Feb. 7, 2017, 11:41 A.M.) [44-2] at RS35.) In response, Fawcett advised Plaintiff that the school was having difficulty finding clinical placements for students in the upcoming cohort and that they would not be able to place her until all current students had a placement. (Email from Carol Fawcett to Rebecca Stanford (Feb. 7, 2017, 6:49 P.M.) [44-2] at RS36.) According to Fawcett, it is school policy that students in the current class must be placed before any returning students. (Decl. of Carol Fawcett ¶ 8.) Plaintiff testified in her deposition that none of Defendant's employees had said "anything critical or unkind that [she] regarded as negative about [her] pregnancy" (Pl.'s Dep. at 40:4–9), but she described her reaction to these

emails received in the days before birth as follows: "I was blown away by them. I felt lied to, shocked" (*Id.* at 52:7–8).

Plaintiff gave birth on February 9, and told Fawcett a few days later. (Email from Rebecca Stanford to Carol Fawcett (Feb. 12, 2017, 10:08 P.M.), Ex. B to Decl. of Rachel Kreft [44-4].) Five days later, on February 14, Plaintiff hand-delivered a note from her midwife providing medical clearance. (*See* Pl.'s Dep. at 36:9–16.) Defendant then soon found a placement for Plaintiff's clinical course at the Clare Physical Therapy clinic in Chicago. (Decl. of Rachel Kreft ¶ 10.) Plaintiff believes that she was able to get that placement at the Clare clinic only because a classmate convinced a clinical instructor to make a spot available. (Pl.'s Local R. 56.1(b)(3)(c) Separate Statement of Additional Undisputed Material Facts [60] ¶ 21.) Nothing in the record supports that contention, however.[7]

Plaintiff was able to begin her clinical course on February 27 at the Clare clinic, an inpatient skilled nursing facility located in Chicago's Gold Coast. (Pl.'s Dep. at 35:17–20, 37:3–10.) Plaintiff completed the clinical course in eight weeks (*id.* at 37:11–16), allowing her to graduate with an Applied Associates of Physical Therapist Assistant Degree in April 2017 (Def.'s Statement of Material Facts [44] ¶ 6). In July 2017, Plaintiff took and passed the Illinois PTA licensing examination on her first try. (*Id.* ¶ 7.) In August 2017, Plaintiff was hired to work as a PTA at ATI Physical Therapy. (*Id.* ¶ 8.)

---

[7]    There are text messages between Plaintiff and another student who had the same clinical instructor at the Clare clinic. (Ex. 3 to Pl.'s Local R. 56.1(b)(3)(c) Separate Statement of Additional Undisputed Material Facts, [60-3] at RS40–RS41.) The texts provided do not establish that the classmate persuaded the clinical instructor to take on another student. Furthermore, in Plaintiff's statement of facts, her only support for this assertion were her own responses to Defendant's first set of interrogatories. (*See* Pl.'s Local R. 56.1(b)(3)(c) Separate Statement of Additional Undisputed Material Facts [60] ¶ 21; *see also* Pl.'s Answer to Def.'s First Set of Interrogs. [60-2] ¶ 3 ("But for Stanford's classmate, who convinced her own clinical instructor to take her on, she would not have had a placement at all.").) "[A] district court may consider answers to interrogatories when reviewing a motion for summary judgment so long as the content of those interrogatories would be admissible at trial." *Hardrick v. City of Bolingbrook*, 522 F.3d 758, 761 (7th Cir. 2008). Plaintiff's statement, for which she lacks foundation and which appears to rest on hearsay, is not admissible.

Plaintiff's starting salary at ATI was $24 per hour, but she testified that "other students who had outpatient clinical experience and bargaining power were able to negotiate an extra dollar an hour." (Pl.'s Dep. at 46:10–18.) Plaintiff did not try to negotiate for a higher wage. (*Id.*) Plaintiff lacked outpatient experience because she was placed at inpatient facilities for both clinical courses (*id.* at 48:19–24). Defendant notes that Comprehensive Therapy in Gary—the placement offered to Plaintiff, which she declined—is an outpatient clinic (Decl. of Monique Flemings [54-1] ¶ 4) and, moreover, that the College does not guarantee students placement at an outpatient facility. (*See* Fox Coll. Physical Therapist Assistant Program Student Handbook at 28.) Plaintiff herself testified that she did not raise any objection to her placement at the Clare clinic (Pl.'s Dep. at 39:3–5), but Kathy Kulinski, who replaced Fawcett as director of the PTA program, recalled that Plaintiff was disappointed at being placed at another inpatient clinic (Decl. of Kathy Kulinski, Ex. 5 to Def.'s Statement of Material Facts [44-5] ¶ 4). According to Kulinski, there were no outpatient clinics available at that time, but she called Plaintiff's clinical instructor to ask that Plaintiff receive as much outpatient exposure as possible during the course. (*Id.*) While Plaintiff has contended that other outpatient facilities were available, she could not identify any that had both an affiliation agreement with Fox College and an open spot for her placement at that time. (Pl.'s Dep. at 50:2–19.)

Plaintiff filed discrimination complaints with the U.S. Department of Education as well as the Illinois Board of Higher Education. (Pl.'s Dep. at 42:21–24, 43:13–17; Ex. 3 to Pl.'s Local R. 56.1(b)(3)(c) Separate Statement of Additional Undisputed Material Facts [60], at RS42–61.) The court is uncertain whether those cases remain pending, but it appears that no action was taken in response by either agency. (*See* Pl.'s Dep. at 43:6–44:16.)

Plaintiff filed her complaint [1] in this court in May 2018 seeking damages and other relief for Defendant's alleged violations of Title IX of the Education Amendments Act of 1972 (Count I), § 302 of the Americans with Disabilities Act of 1990 (Count II), and § 504 of the Rehabilitation Act of 1973 (Count III), as well as Defendant's alleged intentional infliction of emotional distress

(Count IV).  Defendant previously moved to dismiss [9] several of counts in Plaintiff's complaint for failure to state a claim, but the court denied that motion [21].  Defendant now seeks summary judgment on all counts.

<u>**DISCUSSION**</u>

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party moving for summary judgment bears the burden of proving the absence of such a dispute.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant meets that burden, the nonmoving party then bears the burden to demonstrate that there is a genuine dispute of material fact, "such that a reasonable jury could return a verdict in her favor."  *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 773 (7th Cir. 2012).  The burden on the nonmovant "is not onerous," *Liu v. T & H Mach., Inc.*, 191 F.3d 790, 796 (7th Cir. 1999), and the court "construe[s] all facts and reasonable inferences in favor of the nonmoving party."  *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010).  To defeat the motion, however, the nonmoving party must be able to point to more than the "mere existence of a scintilla of evidence in support of" her position.  *Liu*, 191 F.3d at 796.  As discussed below, the court finds that there are no genuine issues of material fact and that Defendant is entitled to judgment as a matter of law on all counts.

**I.     Count I – Title IX Pregnancy Discrimination**

Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Discrimination "on the basis of sex" includes pregnancy discrimination.  *See* 34 C.F.R. § 106.40(b)(1) ("A recipient shall not discriminate against any student . . . on the basis of such student's pregnancy.").  The Supreme Court has found that Title IX implied a private right of

action, authorizing parties to seek monetary damages for intentional violations. *See Doe v. Columbia Coll.*, 299 F. Supp. 3d 939, 949 (N.D. Ill. 2017) (citing *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005)). Title IX does not imply a cause of action for disparate impact, *see id.* at 950, but a plaintiff seeking to establish disparate treatment on the basis of sex ma proceed using Title VII's burden-shifting approach from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g., Andriakos v. Univ. of S. Ind.*, No. 92-3600, 19 F.3d 21 (Table), 1994 WL 83331, at *3–4 (7th Cir. Feb. 17, 1994) (upholding use of *McDonnell Douglas* approach for Title IX case); *Lalowski v. Corinthian Schs., Inc.*, No. 10 C 1928, 2012 WL 245203, at *4–5 (N.D. Ill. Jan. 26, 2012) (applying burden-shifting framework to Title IX claim). Under this approach, Plaintiff makes a showing that she was pregnant, that she was subjected to an adverse action, and that there is a causal connection between her pregnancy and the adverse action. *Varlesi v. Wayne State Univ.*, 909 F. Supp. 2d 827, 856 (E.D. Mich. 2012); *see also Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 229 (2015) (utilizing *McDonnell Douglas* in Title VII case). If Plaintiff can make such a showing, the Defendant is free to offer a nondiscriminatory explanation for the adverse action. *See Young*, 575 U.S. at 229. Plaintiff can then respond by showing that Defendant's "proffered reasons are in fact pretextual." *Id.*

Plaintiff's pregnancy is undisputed. The more difficult issue is whether she suffered an adverse action at all. Plaintiff identifies the following as adverse actions: (1) Defendant's cancelling her placement at the Tinley Park clinic, (2) Defendant's placing her at Comprehensive Therapy in Gary, Indiana, "an area nationally recognized for its egregious rates of rape, murder, and aggravated assault," and (3) Defendant's issuance of an ultimatum that she must either accept the Comprehensive Therapy placement or withdraw from the program. (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. [59] at 3–4.) In the court's view, none of these can be characterized as adverse actions. First, contrary to Plaintiff's own repeated statements, there is no evidence that Defendant cancelled the Tinley Park placement. The record shows it was the Tinley Park clinic that made that decision. (*See* Decl. of Carol Fawcett ¶ 4; *see also* Pl.'s Dep. at

21:8–22:15.)  With respect to the Comprehensive Therapy placement, Plaintiff's theory is, in essence, that Gary is a dangerous city and that it was therefore an adverse action for Defendant to place her at a clinic there while she was pregnant.  But Defendant had placed many other students at that facility over the years, with no complaints or safety issues.  (Decl. of Carol Fawcett ¶ 4; Decl. of Rachel Kreft ¶ 5.)  Moreover, Defendant placed Plaintiff at Comprehensive Therapy because that clinic was willing to extend her term to accommodate time off for childbirth and recovery.  (Decl. of Rachel Kreft ¶ 5.)  Plaintiff's contention that Defendant could have placed her at a clinic that was closer to Defendant's campus and in a safer location is not supported by the record.  The only evidence she offers are the results of a search for physical therapy clinics located close to the campus's zip code.  (Ex. 3 to Pl.'s Local R. 56.1(b)(3)(c) Separate Statement of Additional Undisputed Material Facts, [60-3] at RS1–RS19.)  There is no evidence that the College had affiliation agreements with any of those clinics or that any had spots available for a student.  Finally, although Plaintiff characterizes Defendant's position as an "ultimatum," the College in fact also granted her an exception to standard policy, allowing her to return to the program after missing one term without undergoing the readmissions process or paying additional fees.  Plaintiff, in fact, did return the next term, enabling her to graduate merely weeks later than she would have, had she not lost time for childbirth.

Plaintiff has also not shown that there is a genuine dispute regarding whether Defendant's explanations for these actions were pretextual.  The Seventh Circuit has said that pretext "is [a] lie, specifically a phony reason for some action." *Burton v. Bd. of Educ. of Univ. of Wis. Sys.*, 851 F.3d 690, 698 (7th Cir. 2017) (quoting *Harden v. Marion Cty. Sheriff's Dep't*, 799 F.3d 857, 864 (7th Cir. 2015)).  Plaintiff contends Defendant is not telling the truth when it asserts that there were no other placements available and that placing her at Comprehensive Therapy was part of plan to get her to drop out.  (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. [59] at 3–4.)  Again, however, the only evidence for this contention is the list of other physical therapy clinics located between Defendant's campus and Gary, again without any basis for concluding that these

facilities had affiliation agreements with Defendant or spots available for students.  The court notes that the College initially placed Plaintiff at the Tinley Park clinic *after* she had already disclosed her pregnancy to Fawcett and Flemings, undermining the notion that these two women took action against her due to her pregnancy just weeks later.  *Cf. Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 454–55 (7th Cir. 2009) (discussing the "same-actor inference" and noting that "common sense" made it unlikely the plaintiff was fired on the basis of his age when he was fired by the same manager who had interviewed and hired him only two years before). Finally, the Supreme Court has said that a plaintiff may defeat summary judgment on the pretext issue by showing that "the [school's] policies impose a significant burden on pregnant [students], and that the [school's] 'legitimate, nondiscriminatory' reasons are not sufficiently strong to justify the burden."  *Young*, 575 U.S. at 229.  A "significant burden" can be shown if Defendant accommodated "a large percentage of nonpregnant [students] while failing to accommodate a large percentage of pregnant [students]."  *Id.* 229–30.  There is evidence that only one other student was ever permitted to find his own clinic placement—explained by the student's criminal history.  That single instance is not enough to create a genuine issue of material fact.  Because Plaintiff has not produced enough evidence to permit a jury to find that she suffered from any adverse action or, even if that were not the case, that Defendant's explanations for those actions were pretextual, the court grants Defendant's motion for summary judgment on this count.

## II.      Count II – § 302 of the ADA

Plaintiff has also brought a claim under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181–12189, which provides, "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."  *Id.* § 12182(a).  Defendant, a place of education, is subject to the ADA.  *See id.* § 12181(7)(J).  The ADA defines "disability" to mean "a physical or mental impairment that substantially limits one or more major life activities."

42 U.S.C. § 12101(1)(A); *see also id.* § 12101(2) (defining "major life activities" to include actions like "performing manual tasks," "walking," "standing," "lifting," "bending," and the operation of a "major bodily function," such as the digestive system).  The Seventh Circuit has said that "pregnancy, absent unusual circumstances, is not a physical impairment."  *Serednyj v. Beverly Healthcare, LLC,* 656 F.3d 540, 553 (7th Cir. 2011), *abrogated on other grounds by Young*, 575 U.S. 206.  That is, for ADA claims based on pregnancy, courts "draw a distinction between a normal, uncomplicated pregnancy, and an abnormal one—i.e., one with a complication arising out of, but distinguishable from, the pregnancy."  *Id.*  For example, in *Gabriel v. City of Chi.*, 9 F. Supp. 2d 974, 981 (N.D. Ill. 1998), the plaintiff told her supervisors that she was supposed to engage only in light work due to pregnancy-related back pain, stomach pain, and swelling that prevented her from standing for long periods.  One supervisor forced the plaintiff to exceed her medically cleared working conditions, and she subsequently gave birth two months early.  *Id.*  The *Gabriel* court denied the defendant's motion for summary judgment, holding that the plaintiff had produced sufficient evidence for a reasonable juror to find that her pain and swelling rendered her pregnancy a disability under the ADA.  *Id.* at 983.  Similarly, the court in *Heatherly v. Portillo's Hot Dogs, Inc.*, 958 F. Supp. 2d 913, 920 (N.D. Ill. 2013), found that the plaintiff had presented sufficient evidence to create a triable issue of fact regarding whether she was disabled because she had been instructed to engage in only "light duty" and refrain from "heavy lifting."

The court will assume that a reasonable jury could find that Plaintiff's pregnancy complications were "a physical or mental impairment that substantially limits one or more major life activities."  In her affidavit [18-1], Plaintiff describes suffering from "severe morning sickness," a gastrointestinal virus that led to her hospitalization for one day, migraines so intense that she could not "function or even be in a room with artificial lighting" and that caused her to miss a day of school, and ankles so swollen that she could not remove her pants by herself.  (Decl. of Rebecca Stanford ¶¶ 5–8.)  Moreover, late in the pregnancy, her baby suffered from "decelerations, which are decreases in the fetal heart rate below the fetal baseline heart rate."

(*Id.* ¶ 10.)  Although some of these symptoms, such as morning sickness and swollen ankles, may be common during pregnancies, the combination of numerous severe symptoms is significant enough that a jury could find Plaintiff's pregnancy to have been an "abnormal one." *Serednyj*, 656 F.3d at 553.  Even though Plaintiff was hospitalized for only one day for a virus and missed only one day of class due to her migraines, such a multitude of complications distinguishes this case from *Love v. First Transit, Inc.*, No. 16-cv-2208, 2017 WL 1022191, at *6 (N.D. Ill. Mar. 16, 2017), which held that the plaintiff had not adequately pleaded a disability because her complications lasted only one day.  True, Plaintiff's insistence that she could have completed a hands-on, active clinical course despite these complications could persuade a jury to find that her pregnancy was not a disability (Pl.'s Dep. at 32:22–33:13), but Plaintiff has produced enough evidence to leave this to the trier of fact.

Even with a finding in favor of Plaintiff on the issue of disability, however, relief under Title III of the ADA is available only to a "person who is being subjected to discrimination on the basis of disability . . . or who has reasonable grounds for believing that such person is about to be subjected to discrimination."  42 U.S.C. § 12188(a)(1).  Plaintiff has not even alleged that she is subject to current or imminent future discrimination.  *See Ruffin v. Rockford Mem'l Hosp.*, 181 F. App'x 582, 585 (7th Cir. 2006) (upholding dismissal of complaint that "concern[ed] past events").  Likewise, Title III limits remedies to "preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order."  *See* 42 U.S.C. § 12188(a)(1) (limiting remedies under Title III of the ADA to those provided in § 2000a-3(a)).  In the words of the Seventh Circuit, the remedy for violating this statute is "only injunctive relief—damages are not available under Title III."  *Scherr v. Mariott Int'l*, 703 F.3d 1069, 1075 (7th Cir. 2013); *see also Ruffin*, 181 F. App'x at 585 ("Money damages, however, are not available to private parties under Title III.").  Plaintiff here seeks monetary damages. (*See* Compl. [1] ¶ 38.)  Her response [64] to Defendant's summary judgment motion did not address why relief should be available to her under Title III for

the alleged past discrimination or why she was entitled to money damages under this statute. Defendant's motion is granted on Count II.

### III.   Count III – § 504 of the Rehabilitation Act of 1973

Section 504 of the Rehabilitation Act provides that no one with a "qualified disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). This statute incorporates the ADA's definition of "disability," *id.* § 705(20)(B); Plaintiff's pregnancy could be found to be a disability under the ADA, as the court analyzed above. Unlike Title III of the ADA, however, relief under § 504 includes money damages as well as attorneys' fees, *see id.* § 794a, which Plaintiff seeks under this count (*see* Compl. [1] ¶ 44).

While Plaintiff could demonstrate that she had a disability for purposes of § 504, Defendant is still entitled to summary judgment on this count because she has not produced any evidence (or even alleged) that she informed Defendant of these complications. Section 504 prohibits a failure to accommodate "solely by reason" of a disability. 29 U.S.C. § 794(a). In analogous circumstances, the Seventh Circuit has reasoned "that an employer cannot be liable under the ADA for firing an employee when it indisputably had no knowledge of the disability." *Hedberg v. Ind. Bell Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995). Just as "an employer cannot fire an employee 'because of' a disability unless it knows of the disability," *id.*, so Defendant cannot have failed to accommodate Plaintiff unless it knew of her pregnancy complications. *See James v. Hyatt Regency Chi.*, 707 F.3d 775, 783 (7th Cir. 2013) ("It is well-established under the ADA, that an employee begins the accommodation 'process' by informing his employer of his disability; at that point, an employer's 'liability is triggered for failure to provide accommodations.'") (quoting *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir. 1996)). Nothing in the record, including Plaintiff's affidavit and deposition, indicates that she informed Defendant of the complications of her pregnancy or need for an accommodation as a result of those complications.

There are several references to her pregnancy in communications that both parties included with their summary judgment briefs, but none suggest that any of Defendant's agents knew of Plaintiff's symptoms, let alone their severity or extent.

Even if Plaintiff had informed Defendant of her pregnancy complications, she would still need to show that Defendant failed to offer her a reasonable accommodation or denied her access to a program or activity. *See Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012) (listing elements of a Rehabilitation Act claim). But as the court concluded when discussing her Title IX claim, Plaintiff has failed to produce evidence that Defendant committed such an adverse action against her. Consequently, no reasonable jury could find that Defendant discriminated against Plaintiff in violation of § 504 of the Rehabilitation Act.

## IV. Count IV – Intentional Infliction of Emotional Distress

Finally, Plaintiff asserts that Defendant's conduct gives rise to an intentional infliction of emotional distress ("IIED") claim. To recover damages for IIED in Illinois, Plaintiff must show: (1) "truly extreme and outrageous" conduct, (2) intent to "inflict severe emotional distress" or "know[ledge] that there is at least a high probability that [Defendant's] conduct will cause severe emotional distress," and (3) "the conduct [ ] in fact cause[d] *severe* emotional distress." *Schweihs v. Chase Home Fin, LLC*, 2016 IL 120041, ¶ 50, 77 N.E.3d 50, 63 (2016). While this tort does not encompass "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities," RESTATEMENT (SECOND) OF TORTS § 46, cmt. d (1965), whether conduct qualifies as "extreme and outrageous" depends in part on the parties involved and the "degree of power or authority which a defendant has over a plaintiff," *McGrath v. Fahey*, 126 Ill.2d 78, 86–86, 533 N.E.2d 806, 809 (1988). "Another consideration," an Illinois court has observed, "is the defendant's awareness that the plaintiff is particularly susceptible to emotional distress. Behavior that would not normally be considered outrageous may be actionable if the defendant knows that the plaintiff is particularly susceptible." *Graham v. Commonwealth Edison Co.*, 318 Ill. App. 736, 746, 742 N.E.2d 858, 867 (1st Dist. 2000). Some courts analyzing Illinois IIED claims have

considered pregnant women to be especially vulnerable to emotional distress. *See, e.g.,* *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 606 (7th Cir. 2006) (noting that it was permissible for a jury to consider that the plaintiff was pregnant and upholding the damages awarded to her for an IIED claim); *Wall v. Pecaro*, 204 Ill. App. 3d 362, 368, 561 N.E. 2d 1084, 1088 (1st Dist. 1990) (stating that "by reason of her pregnancy," the plaintiff "was particularly susceptible to emotional distress").

Plaintiff identifies the following as "extreme and outrageous conduct" by Defendant: "persuad[ing] her to drop out of the PTA program and to reenroll in January 2017" and "pushing her to leave a career path she had chosen and already devoted a significant portion of her life to"; placing her at Comprehensive Therapy in Gary, "a city notorious for maintaining one of the highest violent crime rates in the country"; "obstructing her attempt to complete the program she had not only embraced mentally as her chosen vocation in life but toward which she had also committed a significant monetary investment"; and "erect[ing] significant barriers against her attempts to actually return" to the PTA program. (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. [59] at 11–12.) The record does not support any of these contentions, however.

First, Plaintiff chose to withdraw from the PTA program. She was not coerced or strong-armed into doing so. (*See* Engrade Message from Rebecca Stanford to Carol Fawcett (Nov. 17, 2016) [44-2] at RS29 ("I want to thank you again for meeting with me today and providing me with the financial information I needed to make an informed decision and also discussing with me the alternative start date which I was not aware of.").) Defendant made an exception for Plaintiff to the school's standard policy, permitting her to withdraw for one term without having to reapply. (Engrade Message from Carol Fawcett to Rebecca Stanford (Nov. 18, 2016, 9:39 A.M.) [44-2] at RS29; Pl.'s Dep. at 29:11–16.) Indeed, the College granted Plaintiff this exception so that she would not have to retake the clinical course. (Decl. of Rachel Kreft ¶ 7 ("This was offered to her so she would not risk being unable to complete her program if she started before her baby was born and then was unable to complete it within the term.").)

Second, Plaintiff was not placed at Comprehensive Therapy in order to subject her to danger. Plaintiff had expressed a desire to have outpatient experience, and the Gary facility is an outpatient clinic. (Decl. of Monique Flemings [54-1] ¶ 4.) Plaintiff was also reassured that it was in a safe location (Engrade Message from Monique Flemings to Rebecca Stanford (Nov. 17, 2016, 11:06 A.M.) [44-2] at RS27), and she was aware that other students had been placed there (Pl.'s Objs. & Resp. to Def.'s Statement of Material Facts [61] ¶ 10). And the record shows that there were no other closer potential placement spots for Plaintiff at that time. (Decl. of Kathy Kulinski ¶ 4; Pl.'s Dep. at 50:2–19.)

Finally, although there was some doubt about whether she would be able to return to the PTA program on February 27, 2017, Defendant ultimately did find a placement for her. Plaintiff was able to complete her degree at the end of that term, meaning that her graduation was delayed only by a matter of weeks. It was likely upsetting for Plaintiff to receive messages mere days before her delivery date, stating that Defendant did not have a placement for her and that she might have to reapply to the program. (*See, e.g.,* Email from Carol Fawcett to Rebecca Stanford (Feb. 6, 2017, 12:08 P.M.) [44-2] at RS34.) But IIED requires that "the distress inflicted is so severe that no reasonable man could be expected to endure it." *Pub. Fin. Corp. v. Davis*, 66 Ill. 2d 85, 91, 360 N.E.2d 765, 767 (1976) (quoting Prosser, *Law of Torts* § 12 (4th ed. 1971)). Defendant's policies regarding withdrawal, readmission, and clinical placements may be onerous and make it unnecessarily challenging for students to complete the program. (*See* Pl.'s Dep. at 11:16–17 (noting that of the forty-two students who started in Plaintiff's cohort, only about twenty graduated.) But Defendant's application of its policies does not reach the high bar required of outrageous conduct required for an IIED claim.

In addition, Plaintiff has not produced sufficient evidence that any Fox College employees intended to cause her severe emotional distress or took action knowing that severe emotional distress was likely to result. There is likewise no evidence of the last element of an IIED claim— that Plaintiff suffered from *severe* emotional distress. In response to Defendant's statement that

she was not treated for any mental health issues during or after her enrollment at the school, Plaintiff says that she "confided in her sister-in-law, who is a social worker, and a pediatrician for her daughter regarding post-partum issues, feelings of being overwhelmed with school and being a new mother, and her negative experiences with Defendant." (Pl.'s Objs. & Resp. to Def.'s Statement of Material Facts [61] ¶ 46.) Neither Plaintiff's deposition nor her affidavit substantiates this assertion, nor has she offered documentation of any treatment she sought. (Pl.'s Resp. to Def.'s First Req. for Produc. of Docs. ¶ 8.) The court agrees with Defendant that the evidence is not sufficient to create a genuine issue of material fact. *EEOC v. Flambeau, Inc.*, 846 F.3d 941, 946 (7th Cir. 2017) ("When the only evidence of emotional distress comes from the injured party's testimony, 'he must reasonably and sufficiently explain the circumstances of his injury and not resort to mere conclusory statements.'") (quoting *Biggs v. Vill. of Dupo*, 892 F.2d 1298, 1304 (7th Cir. 1990)). Because Plaintiff has not pointed to more than "mere existence of a scintilla of evidence in support of" her position, *Liu*, 191 F.3d at 796, the court grants Defendant's motion for summary judgment on this count.

## CONCLUSION

For the foregoing reasons, the court denies Plaintiff's motion to strike [49] and grants Defendant's motion for summary judgment [42] on all counts. Judgment will enter in favor of Defendant.

ENTER:

Dated: February 19, 2020

_____
REBECCA R. PALLMEYER
United States District Judge